## L. W. & P. ARMSTRONG, Inc. v. THE MORMACMAR et al.

### No. 202, Docket 22271.

United States Court of Appeals Second Circuit.

Argued March 6, 1952.

Decided May 5, 1952.

Hill, Rivkins & Middleton, Arthur O. Louis and Gregory S. Rivkins, all of New York City, for L. W. & P. Armstrong, Inc., libellant-appellant, and Home Ins. Co., appellant.

Burlingham, Veeder, Clark & Hupper, Chauncey I. Clark and Herbert M. Lord, all of New York City, for Moore-McCormack Lines, Inc., respondent-appellee.

Myles J. Lane, U. S. Atty., New York City, William H. Postner, New York City, for United States of America, respondent-appellee.

Before L. HAND, AUGUSTUS N. HAND and CHASE, Circuit Judges.

AUGUSTUS N. HAND, Circuit Judge.

L. W. & P. Armstrong, Inc., the appellant, was the consignee and owner of 75 bales of gunnies which were shipped from Calcutta, India, destined for New York aboard the S. S. Mormacmar. The Mormacmar sailed from Calcutta on December 24, 1942 and arrived at Wellington, N. Z., on January 30, 1943. While at Wellington, repairs of a temporary nature were made on the after peak tank in which leaks had been discovered prior to the vessel's arrival at that port. The vessel left Wellington on February 5, 1943 and soon after her departure new leaks were discovered. Because of the lack of sufficient fresh water for the long voyage to the Panama Canal, the master decided to return to Wellington as a port of refuge. The vessel arrived there on February 7, 1943 and a general average was declared. On the next day part of the cargo, including the gunnies above mentioned, was discharged and placed in warehouses so that the vessel might be lightened for drydocking. Reloading of the cargo commenced on February 21, 1943 after the repairs were completed. During the evening of the 21st a fire broke out in one of the warehouses in which the cargo was stored and 41 bales of gunnies were destroyed.

The present libel was instituted by Armstrong on September 25, 1944 to recover the value of the gunnies destroyed in the fire. The United States of America as owner of the Mormacmar and the Moore-McCor-

mack Lines, Inc., and the Isthmian Steamship Company as general agent and berth agent respectively were named as respondents.[1] The libel set forth three separate claims. Under the first, the respondents were charged with liability for breach of the contract of carriage, i. e., failure to deliver the cargo. This cause of action was dismissed by the district court for the reason that the libel was not brought within the one-year period prescribed in the bill of lading. See also 46 U.S.C.A. § 1303(6). No appeal was taken from that dismissal.

■ The second cause of action was predicated on the theory that the return of the Mormacmar to Wellington was a deviation, with the consequence that the respondents were absolutely liable for the loss of the cargo which occurred thereafter. However, the court below found that there had been no deviation and dismissed this claim also. On this appeal the appellant attacks the findings of the lower court and argues that the return to Wellington for further repairs constituted a deviation since the return was made necessary only because of the respondents' failure to exercise due diligence to put the vessel in a seaworthy condition on her first call at that port. Even assuming that the respondents' lack of diligence was the cause of the peril which confronted the vessel after she left Wellington, there could be no liability for a deviation since the return to Wellington was required for the safety of the crew. Republic of France v. French Overseas Corp. (The Malcolm Baxter), 277 U.S. 323, 332, 48 S.Ct. 516, 72 L.Ed. 901; see also the Carriage of Goods by Sea Act, 46 U.S.C.A. § 1304(4).

The third and final cause of action alleged that the respondents were liable as insurers for the cargo destroyed ashore because they had failed to obtain port-of-re-

fuge insurance on the cargo when the Mormacmar returned to Wellington. This claim was sustained by the district court in its interlocutory decree and a commissioner was appointed to report as to damages. At the hearing before the commissioner the respondents introduced evidence to the effect that the cargo in suit was insured by Armstrong with the Home Insurance Company and that the latter had paid Armstrong $3,840.33 for the loss of the 41 bales of gunnies.[2] Armstrong, on the other hand, contended that it had not been paid but that the transaction by which it received the sum of $3,840.33 from its insurer was merely a loan. The document evidencing the transaction read as follows:

"Received from the Home Insurance Company, the sum of Three Hundred [sic] Eight Hundred forty & 33/100 Dollars ($3,840.33) as a loan and repayable only to the extent of any net recovery we may make from any carrier, bailee or others, on account of loss to our property (described below) due to loss of or damage thereto on 'Mormacmar' on or about July/43, or from any insurance effected by any carrier, bailee or others on said property, and as security for such repayment thereby pledge to the said Home Insurance Company, the said recovery and deliver to it, duly endorsed, the bills of lading for said property and we agree to enter and prosecute suit against said carrier, bailee or others on said claim with all due diligence at the expense and under the exclusive direction and control of the said Home Insurance Company."

■ On exceptions to the commissioner's report, the district court held that Armstrong had failed to show any damages, 93 F.Supp. 930. We concur in this view and

---

1. Jurisdiction to sue the United States was based on the Suits in Admiralty Act, 46 U.S.C.A. § 742. The district court dismissed the libel as against the respondent Isthmian Steamship Company and no appeal was taken from that part of the decree.

2. The appellant contends that it was error on the part of the commissioner and of the district court to admit this evidence. But the reference to the commissioner was for the purpose of determining damages and any evidence of payment for the loss in suit by the appellant's insurer was relevant to that inquiry and properly received.

do not think that Luckenbach v. W. J. Mc-Cahan Sugar Refining Co., 248 U.S. 139, 39 S.Ct. 53, 63 L.Ed. 170, requires a different result. That decision only held that the shipper had not been paid by its insurer where it remained under a duty to repay money it had received as a loan. But the question here is whether Armstrong sustained any damage by virture of the failure of the respondents to insure the cargo. If the money received by Armstrong from its insurer was not repayable, no damage was shown for Armstrong would then have been fully reimbursed for its loss. According to the terms of the loan receipt the loan was repayable only on the condition that there be a net recovery from the carrier for the loss of Armstrong's property. Since it has been held that neither of the respondents is liable for the loss of the cargo, the loan was transformed into a "final, complete payment, for there will not be any recovery by [Armstrong] from which the loan would be repayable."

We find no error in the district court's denial of the petition of the Home Insurance Company for leave to intervene. Irrespective of any procedural defect, see Defense Plant Corp. v. United States Barge Lines, 2 Cir., 145 F.2d 766, the Home Insurance Company had no right or interest to assert in the proceedings greater than that of Armstrong, its insured. As an insurer it was subrogated to the rights of Armstrong and the district court's final decree dismissing the libel of Armstrong necessarily disposed of any claim of the Home Insurance Company.

Accordingly, the decree is affirmed.

L. HAND, Circuit Judge (concurring).

I concur, but for slightly different reasons. I have come finally to agree with Judge Medina that any duty to insure goods, put ashore to permit a ship's repair pending a general average adjustment, should be regarded as a part of her duty to "load, handle, stow, carry, keep, care for, and discharge the goods carried";[1] more particularly, as a part of her duty to "care for" them. It would, I think, be most un-reasonable to impute to Congress an intent to grant to the breach of such a duty a longer limitation than to the breach of the duty to protect the goods from physical injury. It is of course true that a duty to insure will cover occasions, when the loss results from no failure of the carrier to "care for" the goods; nevertheless, the context of that phrase may enlarge its literal scope and include—when such an added duty exists—indemnifying the owner against all mischances, even those for which he is not at fault. All interpretation is a hazard, and I have been in much doubt; but the foregoing seems to me the most reasonable construction. Since the suit against the United States was therefore brought too late,[2] it is not necessary to decide whether the libellant suffered any loss. It was right to dismiss the claim against Moore-McCormack Lines, Inc. for another reason as well. Cosmopolitan Shipping Co. v. McAllister, 337 U.S. 783, 69 S.Ct. 1317, 93 L.Ed. 1692.

I understand that my brethren agree that the one year statute of limitations is applicable but also wish to dispose of the case on the merits.